**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Edward Harold Schad, Jr. and Robert Glen Jones, Jr., | No. CV-13-2001-PHX-ROS |
| Plaintiffs, | DEATH PENALTY CASE |
| vs. | |
| Janice K. Brewer, et al., | **ORDER** |
| Defendants. | |

Plaintiff Edward Schad, Jr., and Robert Glen Jones, Jr., sought a preliminary injunction directing Defendants to disclose information about the lethal-injection drugs that will be used in Plaintiffs' executions. On October 4, the Court held an evidentiary hearing, issued a preliminary order granting the request for a preliminary injunction, in part, and indicated that a more detailed ruling would follow. (Doc. 23.) This is that ruling.

## BACKGROUND

In the two-count complaint, Plaintiffs sue the following Defendants: Arizona Governor Janice K. Brewer; Charles L. Ryan, Director of the Arizona Department of Corrections (ADC); Ron Credio, Warden of the ADC Eyman Complex; and Lance Hetmer,

Warden of the ADC Florence Complex. In Count One, Plaintiffs allege that Defendants have violated their First Amendment right of access to governmental proceedings by concealing information about the manner in which the State will carry out their execution. In Count Two, Plaintiffs allege that Defendants have violated their right to due process and access to the courts by failing to disclose information about the lethal-injection drugs they intend to use to execute them. In the Prayer for Relief, Plaintiffs seek an injunction prohibiting Defendants from

> concealing information that is not related to executions, and that is necessary to ensuring Plaintiff's First Amendment right of access to governmental proceedings, including but not limited to information about
>
> a. The manufacturer of lethal-injection drugs
>
> b. The NDCs of lethal-injection drugs
>
> c. The lot numbers of lethal-injection drugs
>
> d. The expiration dates of lethal-injection drugs
>
> e. Documentation indicating that those who will handle pentobarbital or other controlled substances in the execution have the appropriate DEA authorization to do so.

(Doc. 1 at 16.)

In support of the complaint, Plaintiffs attached several letters requesting information about the drugs ADC intends to use in Plaintiffs' executions and the responses to those letters. On July 19, 2013, Dale Baich, Jones's lawyer, writing on behalf of both Jones and Schad, requested that Director Ryan disclose the manufacturer of the lethal-injection drugs, the lot numbers and expiration dates of the drugs, whether they came from domestic or foreign sources, whether they are approved by the Federal Drug Administration (FDA), and the credentials of the execution team members authorizing them to handle controlled substances. (Doc. 1, Ex. A.) On July 30, 2013, Director Ryan responded that ADC intended to follow the one-drug protocol set forth in Department Order (DO) 710 and that "ADC intends to use unexpired, domestically obtained Pentobarbital for these executions." (Doc. 1, Ex. B.)

1   On August 6, 2013, Baich again wrote Ryan requesting the name of the manufacturer
2   of the drug, the brand name of the drug, the expiration date, whether the drug is compounded,
3   and the Drug Enforcement Administration (DEA) registrations authorizing the execution
4   team members to handle controlled substances. (Doc. 1, Ex. C.) On August 16, Director
5   Ryan responded that the name of the drug's manufacturer and source of the drugs are
6   confidential and not subject to disclosure under A.R.S. § 13-757(C) and that the credentials
7   of the execution team could be found in DO 710. (Doc. 1, Ex. D.)

8   On September 25, 2013, in response to a public records request by the American Civil
9   Liberties Union of Arizona (ACLU), ADC General Counsel Dawn Northup provided a
10  highly redacted document regarding the acquisition of the execution drugs. (Doc. 1, Ex. E.)
11  The document reveals only that the drug is Nembutal® that was purchased sometime in 2011.
12  *Id.* The response explained that the redacted information is confidential under A.R.S. § 13-
13  757(C). *Id.* Plaintiffs allege that no further information responsive to their requests has been
14  provided by Defendants.

15  Plaintiffs also allege that there is reason to believe that the lethal-injection drugs ADC
16  intends to use are expired. They allege that the only FDA-approved source of pentobarbital,
17  a Schedule II drug, is sold under the brand name Nembutal®. Counsel claims that ADC
18  provided Nembutal® procurement records in August 2011 in unrelated litigation. That
19  Nembutal® was ordered on September 27, 2010, and it was the only Nembutal® possessed
20  by ADC as of August 2011. The Nembutal® obtained in 2010 was set to expire in March
21  2013. Plaintiffs allege that the only source of Nembutal® from 2010 through January was a
22  pharmaceutical company named Lundbeck. In July of 2011, Lundbeck instituted distribution
23  controls to prevent the legitimate sale of Nembutal® to departments of corrections in states
24  that use lethal injection for capital punishment. In December 2011, Lundbeck sold its
25  interest in Nembutal® to Akorn, which retained Lundbeck's distribution controls. Therefore,
26  Plaintiffs surmise, that as of July 2011, ADC had no legitimate source for Nembutal® and the
27  only Nembutal® ADC possessed as of August 2011 expired in March 2013.

28  Plaintiffs' first claim for relief is based on the First Amendment. Relying on

- 3 -

1  *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002), Plaintiffs
2  claim that Defendants' deliberate concealment of information about the lethal-injection drugs
3  and the authority of the execution team to handle controlled substances deprives them of their
4  First Amendment right of access to governmental proceedings.  Second, Plaintiffs claim that
5  Defendants' concealment of the information Plaintiffs requested violates their right to due
6  process and meaningful access to the courts by preventing them from discovering whether
7  they have a colorable claim that their executions will be carried out in violation of the Eighth
8  Amendment.  In their motion for preliminary injunction, Plaintiffs assert that they are likely
9  to succeed on those two claims; that without a preliminary injunction, they will suffer
10 irreparable harm; that the balance of equities are in their favor; and that disclosure of the
11 requested information will serve the public interest.

12 In response to Plaintiffs' request for injunctive relief, Defendants argue that Plaintiffs
13 are unlikely to succeed on the merits because they have no facially plausible Eighth
14 Amendment claim; they have no First Amendment right to know the manufacturer of the
15 lethal-injection drugs or the DEA authorization of the execution team; that Arizona's
16 executioner-confidentiality statute, A.R.S. § 13-757(C), prohibits disclosure of the
17 information Plaintiffs seek; that the state has a legitimate interest in protecting its drug
18 sources from public attack; and that Plaintiffs' due process claim cannot succeed because
19 their access to the courts has not been hindered.  Defendants also argue that Plaintiffs will
20 not suffer irreparable injury because they have not raised a plausible claim that their
21 executions will be unconstitutional.  Finally, they argue that the balance of hardships tips in
22 their favor because the state has a "strong interest in enforcing its criminal judgments without
23 undue interference from the federal courts."  (Doc. 17 at 12) (quoting *Hill v. McDonough*,
24 547 U.S. 573, 584 (2006)).

25 The Court gave both parties the opportunity to call witnesses at the hearing held on
26 October 4, 2013.  Neither party did so.  They instead relied solely on documentary evidence
27 submitted before and during the hearing.  Therefore, the record is presently underdeveloped
28 and this order is based solely on the parties' limited submissions.  As set forth in more detail

- 4 -

below, Defendants' failure to come forward with *any* evidence figures prominently in the Court's analysis.

## ANALYSIS

### I.  Standard for Injunctive Relief

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted) (emphasis in original). The Ninth Circuit has adopted two tests a district court must use when deciding whether to grant a preliminary injunction. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding District Court "made an error of law" by employing only one test when denying preliminary injunction). First, a plaintiff can attempt to satisfy the four-part test adopted by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Under the *Winter* test, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. If a plaintiff cannot meet the *Winter* test, he may attempt to satisfy the second test by showing there are "serious questions going to the merits," the balance of hardships tips sharply in his favor, there is a likelihood of irreparable injury, and the injunction is in the public interest. *Cottrell*, 632 F.3d at 1135. This latter "sliding scale approach" allows a plaintiff to make a lesser showing of likelihood of success provided he will suffer substantial harm in the absence of relief. *Id.* at 1133.

In the context of a capital case, the Supreme Court has emphasized that these principles apply when a condemned prisoner asks a federal court to enjoin his impending execution because "[f]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573, 583-84 (2006). Rather, "a stay of execution is an equitable remedy" and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.* at 584.

**II. First Amendment Right of Access to Governmental Proceedings**

As in *California First Amendment Coalition v. Woodford*,

> The issues presented involve the balance between the State's ability to carry out executions in a safe and orderly manner and the public's right to be informed about how the State and its justice system implement the most serious punishment a state can exact from a criminal defendant—the penalty of death.

299 F.3d 868, 873 (9th Cir. 2002). In *California First Amendment Coalition*, the Ninth Circuit held that the press and the public has a First Amendment right to view execution proceedings from the moment the condemned enters the execution chamber to the time he is pronounced dead. *Id.* at 885-86. It also held that California's Procedure 770 prohibiting the public from viewing the initial stages of the procedure until after the execution team exited the chamber was an exaggerated response to the prison officials' asserted legitimate interest in the safety of prison staff. *Id.* Defendants correctly note, however, that *California First Amendment Coalition* did not expressly extend the First Amendment right of access to information about the nature of the lethal-injection drugs, their source, or the DEA certification of the execution team.[1] The Court must therefore first determine whether the First Amendment right of access to governmental proceedings extends to disclosure of information about the means used to carry out an execution.

The well-settled right of access to governmental proceedings "is premised on 'the common understanding that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.'" *Id.* at 874 (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982)). "By guaranteeing that 'the individual citizen can effectively participate in and contribute to our republican system of self-government,' the

---

[1] Defendants also argue that the holding extended only to the press and the public—not prisoners. This argument requires little discussion. A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Defendants do not argue that legitimate penological interests preclude prisoners—as opposed to the public in general—from exercising any putative First Amendment right to access information about their executions.

- 6 -

1 First Amendment right of access ensures that 'this constitutionally protected discussion of
2 governmental affairs is an informed one." *Id.* (quoting *Globe Newspaper*, 457 U.S. at 604-
3 05).

4 Whether the public has a First Amendment right of access to particular governmental
5 proceedings is informed by two "complimentary considerations": (1) "whether the place and
6 process have historically been open to the press and general public" and (2) "whether public
7 access plays a significant positive role in the functioning of the particular process in
8 question." *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986). This two-pronged
9 test leads the Court to conclude that there is a First Amendment right of access to information
10 about the means used to carry out an execution.

11 As the Ninth Circuit explained in *California First Amendment Coalition*,
12 "[h]istorically, executions were fully open events in the United States." 299 F.3d at 875.
13 Moreover, the court rejected the state's argument that the right of public access does not
14 extend to the "initial execution procedures" that take place before the lethal injection drugs
15 actually start to flow. *Id.* at 876. It explained that the "public and press historically have
16 been allowed to watch the condemned inmate enter the execution place, be attached to the
17 execution device and then die." *Id.* Those historically fully-open executions included
18 hangings and executions by lethal gas. *Id.* The court therefore concluded that the "historical
19 tradition strongly supports the public's First Amendment right to view the condemned as the
20 guards escort him into the chamber, strap him to the gurney and insert the intravenous lines."
21 *Id.*

22 With historical executions, the actual means of execution was open and obvious to the
23 public: rope, sodium cyanide gas, and electricity. The public could not only view the
24 prisoner's death, they could see the precise cause and its effects. The public and the press
25 therefore historically were allowed to see the specific means used to execute the prisoner.
26 The only evidence of Arizona's historical practices offered at the hearing was that recently
27 Arizona disclosed *all* information regarding its supply of execution drugs. In light of this
28 fact, as well as the fact that, historically, the means of execution were open and obvious, the

1 first *Press-Enterprise* consideration supports allowing access to the information Plaintiffs
2 seek.

3 The second *Press-Enterprise* consideration also supports a First Amendment right to
4 know certain details regarding the lethal-injection drug. Public access to information about
5 lethal injection drugs plays a significant positive role in the functioning of capital
6 punishment. "An informed public debate is critical in determining whether execution by
7 lethal injection comports with 'the evolving standards of decency which mark the progress
8 of a maturing society.'" *California First Amendment Coalition*, 299 F.3d at 876 (quoting
9 *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). "To determine whether lethal injection executions
10 are fairly and humanely administered, or whether they ever can be, citizens must have
11 reliable information about the 'initial procedures,' which are invasive, possibly painful and
12 may give rise to serious complications." *Id.* So too, the public must have reliable
13 information about the lethal-injection drugs themselves in order to judge the propriety of the
14 particular means used to carry out an execution.

15 Because there is both an historical tradition with public access to information about
16 the means of executions and a public importance of public access to that information, the
17 Court holds that the public enjoys a First Amendment right of access to specific information
18 about the drugs that are "inextricably intertwined with the process of putting the condemned
19 inmate to death." *Id.*

20 **III. The *Turner* Test**

21 Having determined that *California First Amendment Coalition* should extend to the
22 information Plaintiffs seek, the Court must analyze whether Defendants' refusal to provide
23 the information "is reasonably related to legitimate penological objectives, or whether it
24 represents an exaggerated response to those concerns." *California First Amendment*
25 *Coalition*, 299 F.3d at 878 (citing *Turner v. Safely*, 482 U.S. 78, 87 (1987) (quotation
26 omitted)). That demonstration requires consideration of four factors: (1) whether there is a
27 "valid rational connection" between Defendants' refusal and the legitimate governmental
28 interest put forward to justify it; (2) whether alternative means of exercising the right remain

- 8 -

open to the prisoner; (3) the impact the accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources generally; and (4) whether there are "ready alternatives . . . that fully accommodate[] the prisoner's rights at *de minimis* cost to valid penological interests." *Id.* at 89-90.

### 1. Rational Relationship to a Legitimate Penological Interest

Viewed charitably, Defendants proffer two legitimate penological interests non-disclosure serves. First, Defendants argue non-disclosure is mandated by a state law protecting the identity of certain "persons." Second, Defendants claim non-disclosure is necessary to ensure an ongoing supply of drugs. Neither argument is persuasive.

Defendants' primary basis for refusing to produce the requested information is that the drug's source is "confidential and is not subject to disclosure under A.R.S. § 13-757(C)." That statutes provides: "[t]he identity of executioners and other persons who participate or perform ancillary functions in an execution and any information contained in records that would identify those persons is confidential and is not subject to disclosure." Assuming compliance with this statute can serve as a legitimate penological interest, the question is whether the drug's manufacturer is a "person" performing an "ancillary function" in the execution process.

As Plaintiffs note, the Court already rejected this argument in *Landrigan v. Brewer*, No. CV-10-2246-PHX-ROS, 2010 WL 4269559, at * 12 (D. Ariz. Oct. 25, 2010), *rev'd on other grounds Brewer v. Landrigan*, 131 S.Ct. 445 (2010):

> The Arizona statute cannot be read as protecting the disclosure of any information which might eventually, somehow, lead to the "identity of executioners and other persons." Defendants do not point to any provision in the statute itself in support of this claim. If the Arizona Legislature wished to protect all individuals potentially involved in executions, the statute should not have provided protection only to "executioners and other persons who participate or perform ancillary functions in an execution." The statute instead would provide protection to all information conceivably related to the execution.

In this instance, Defendants again fail to cite any authority for their interpretation of the Arizona statute, and the Court finds that principles of statutory construction do not

- 9 -

support construing the language in such a broad manner. Indeed, if the pentobarbital manufacturer were among those "persons" who perform ancillary functions, it is difficult to imagine any information that could be disclosed under the statute, which, as explained above, is wholly inconsistent with the First Amendment guarantee of access to the procedures by which inmates are executed.[2]

Defendants' second attempt at justifying non-disclosure is to point to the State's need to obtain the drugs necessary to carry out lawfully ordered executions. By identifying the source of those drugs, Defendants claim the manufacturers and distributors could be besieged by negative attention, refuse to provide lethal injection drugs in the future, and thereby prevent the state from fulfilling its duty. This concern echoes directly Chief Judge Kozinski's dissental in *Landrigan v. Brewer*, where he justified the State's refusal to disclose information about the foreign-source of the drug it intended to use in Landrigan's execution because of the State's interest in "avoiding a public attack on its private drug manufacturing sources."[3] 625 F.3d 1132, 1143 (9th Cir. 2010) (Kozinski, C.J., dissenting from denial of rehearing en banc). There are two problems with Defendants' reliance on this argument: Chief Judge Kozinski's speculation is not sufficient evidence to establish a legitimate

---

[2] Moreover, it was state officials who disclosed similar information in *Landrigan v. Brewer* and *West v. Brewer*. Defendants have not explained why their application of the confidentiality statute varies from case to case and, much more importantly, have not pointed to any evidence establishing adverse events as a result of those disclosures.

[3] Although the state has a legitimate interest in maintaining its supply of lethal-injection drugs, Chief Judge Kozinski's opinion seems to assume the state can pursue that interest by suppressing public protest and debate about the source of those drugs. The Court doubts that to be the case. Also, the events that followed the *Landrigan* case illustrate why a court should not be so willing to accept the type of speculation Chief Judge Kozinski engaged in. The motivation for non-disclosure in *Landrigan* likely was more that the drugs had been obtained illegally, instead of a legitimate belief that suppliers would be harassed. *See Cook v. Food & Drug Admin.*, Nos. 12-5176 and 12-5266, 2013 WL 3799987, *10 (D.C. Cir. July 23, 2013) ("The FDA acted in derogation of [its] duties by permitting the importation of thiopental, a concededly misbranded and unapproved new drug, and by declaring that it would not in the future sample and examine foreign shipments of the drug despite knowing they may have been prepared in an unregistered establishment.").

- 10 -

interest; and, even accepting Chief Judge's Kozinski's speculation regarding the interest, Defendants' actions go well beyond what is necessary to serve that interest.

In cases such as this, the Ninth Circuit has repeatedly stressed the need for state officials to present evidence supporting their arguments that public access to execution information will cause problems. In *California First Amendment Coalition* the court stressed that the state "must at a minimum supply some evidence that such potential problems are real, not imagined." 299 F.3d at 882. And in *Associated Press v. Otter*, 682 F.3d 821, 825 (9th Cir. 2012), the court chastised Idaho officials for presenting arguments based on "pure speculation" with "no evidence to support" them. Defendants' presentation in this case suffers from the same flaw.

Defendants have offered no admissible evidence in support of their claim that revealing the information Plaintiffs seek would result in Arizona losing the ability to obtain future execution drugs. Defendants' only attempted evidentiary submission was a letter from a pharmacy in Texas. That pharmacy had produced and supplied pentobarbital for the Texas Department of Criminal Justice. Even assuming the letter is admissible evidence—a doubtful proposition—Defendants' reliance on this evidence is misplaced. Defendants offered no evidence that calls and letters would prevent a corporation from operating or would be sufficiently disruptive to force them to refuse to sell its product to the Arizona Department of Corrections. In fact, there is absolutely no evidence that Lundbeck's July 2011 decision to restrict the acquisition of pentobarbital by states with active lethal injection programs was in response to a public backlash. Lundbeck explained that the reason for its decision was because it "adamantly opposed the distressing misuse of our product in capital punishment"—not because it feared a public backlash. (Doc. 11, Ex. I at 1.)

In addition to not offering evidence, Defendants also failed to link their alleged penological interest to their actions. Defendants' concern with preserving its supply of drugs has no obvious connection to the expiration date or lot number of the pentobarbital. There simply is no evidence in the record that the manufacturer's identity could be gleaned from this information. Thus, there is absolutely no connection between keeping that information

- 11 -

secret and the interest in maintaining a source of lethal injection drugs. *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir.2001) ("The rational relationship of the *Turner* standard is a *sine qua non*."). Defendants also failed to offer evidence that revealing the National Drug Code will, by necessity, reveal the supplier or manufacturer. Thus, again, keeping the National Drug Code confidential has no connection to Defendants' alleged interest. Therefore, the only piece of information with an obvious connection to Defendants' speculative interest is the identity of the manufacturer itself.

The evidence available at present, however, shows that revealing the manufacturer will not frustrate Defendants' interest. Arizona previously disclosed the manufacturer of its lethal injection drugs. *See* Document 39 in *West v. Brewer*, CV-11-1409-PHX-NVW. And at the October 4, 2013 hearing, Defendants could not articulate any harm stemming from that disclosure. In other words, the state chose not to provide this Court with any evidence on which the Court might conclude that there is a real risk that Arizona's supply of drugs will be cut off. Unlike the situation in *Otter*, 682 F.3d 821, 825 (9th Cir. 2012), Defendants did not offer even conclusory declarations. Accordingly, Defendants may be able to establish a legitimate interest in keeping confidential Arizona's source of lethal injection drugs. But they have not presented a sufficient basis to so hold in this particular case.

For these reasons, the Court finds that the State's refusal to disclose the requested information constitutes an exaggerated response to their asserted penological justification. *See California First Amendment Coalition*, 299 F.3d at 882. The only exception to this conclusion involves a final piece of information Plaintiffs seek: documentation indicating that those who will handle pentobarbital or other controlled substances in the execution have the appropriate DEA authorization to do so. This disclosure may result in the identification of individuals involved in the actual execution process. *California First Amendment Coalition* explicitly discussed the concern of identifying individuals involved in executions and, indeed, affirmed the practice of using surgical garb to conceal those individuals' identities. 299 F.3d at 884-85. The Court recognizes that Defendants have a legitimate interest in preserving the anonymity of execution team members and will not require

Defendants disclose information that may lead to a loss of that anonymity.

In light of Defendants' failure to satisfy the first *Turner* factor, the Court need not continue its analysis. *See Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (holding that a court need not examine the remaining *Turner* factors once the first is resolved in either party's favor). The Court will do so, but only in brief.

### 2.     Alternative Means of Exercising the Right

The Court next considers whether Plaintiffs have alternative means of exercising the constitutional right they seek to assert. *Turner*, 482 U.S. at 90. There is no dispute that Plaintiffs have no alternative means of obtaining the information they seek. The Supreme Court explained in *Overton v. Bazzetta* that "[w]ere it shown that no alternative means of [exercising the asserted constitutional right] existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable." 539 U.S. 126, 135 (2003). The Court therefore finds that this factor weighs in Plaintiffs' favor.

Further, not only is vindication of this right important for Plaintiffs to know and understand the origin of the drugs that will be used to execute them, but providing this information to the public furthers the complementary goal of "[a]n informed public debate" which "is the main purpose for granting a right of access to governmental proceedings." *California First Amendment Coalition*, 299 F.3d at 884. Ensuring a vigorous public debate is particularly important when we know that the State previously imported two shipments of a controlled substance in violation of the federal Controlled Substance Act, *see* Doc. 11-1, Ex. F, and the federal Food, Drug, and Cosmetics Act. *Cook v. FDA*, Nos. 12-5176, 12-5266, 2013 WL 3799987 (D.C. Cir. July 23, 2013).

### 3.     The Impact of Accommodation on Prison Resources

Another relevant consideration is the impact that accommodation of the asserted right would have on guards, other inmates, the allocation of prison resources, and the safety of visitors. *See Turner*, supra, at 90. Accommodating Plaintiffs' request would have no impact on prison resources. But this factor also conflates with the first *Turner* factor and Defendants' speculative assertion that disclosure of the requested information will have

deleterious results. But, as stated in *California First Amendment Coalition*, "we will not accord defendants deference on the basis of mere speculation." 299 F.3d at 884.

### 4. Presence or Absence of Ready, Low-Cost Alternatives

As for *Turner's* final factor, the State's refusal to disclose information in this action is, again, undercut by their disclosure without consequences in *West*. *See Ashelman v. Wawrzaszek*, 111 F.3d 674, 678 (9th Cir.1997) (finding that accommodation of some prisoners' religious dietary rights without disruption precluded a finding that the difficulties envisioned by the prison were insurmountable).

In sum, none of the *Turner* factors weigh in the State's favor. A.R.S. § 13-757(C) does not apply and there is no evidence that the refusal to disclose the requested information will serve Defendants' interest in preserving its supply of drugs. Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claim.

## IV. Irreparable Injury & Balance of Equities

The failure to disclose information about the lethal-injection drugs will cause Plaintiffs irreparable injury because "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably causes irreparable injury.'" *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (granting a preliminary injunction requiring Idaho to allow witnesses to view an entire execution) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Court's balancing of the equities "turns on whether there is any realistic possibility that a preliminary injunction will delay [Plaintiffs'] execution." *Id.* As in *Associated Press*, "there is minimal chance that the injunction will lead to a successful stay application by [Plaintiffs]. Not only is the prospect of such application speculative, but if filed, it would likely fail." *Id.* Moreover, as discussed above, Defendants have failed to persuade the Court that disclosure of the manufacturer of the lethal-injection drugs will cause significant harm to the Defendants. Accordingly, the balance of equities tips in Plaintiffs' favor.

## V. The Public Interest

The public has a legitimate interest in the timely enforcement of criminal judgments. *Id.* But in light of the Court's conclusion that a preliminary injunction is not likely to delay Plaintiffs' executions, that interest carries no weight. In contrast, there is a substantial public interest in vindicating First Amendment principles. *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."). Accordingly, the public interest will best be served by granting a preliminary injunction in this case.

## VI. Due Process and Access to the Courts

Unlike their First Amendment claim, Plaintiffs have presented no plausible basis for injunctive relief on their due process claim. According to Plaintiffs, Defendants' concealment of the drug information violates their right to due process and meaningful access to the courts by preventing them from discovering whether they have a colorable claim that their executions will be carried out in violation of the Eighth Amendment. As a matter of standing to assert an access to the courts claim, a plaintiff must show that he suffered an "actual injury" with respect to contemplated litigation; the plaintiff must demonstrate that the conduct of the defendants prevented him from bringing to court a nonfrivolous claim for relief. *Lewis v. Casey*, 518 U.S. 343, 351-53. An "actual injury" is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or present a claim." *Id.* at 348. The right of access to the courts does not include a right to discover causes of action or to litigate effectively once in court. *Id.* at 354.

Here, Plaintiffs allege that because of Defendants' failure to disclose information, "they cannot even *assess* whether they have a valid Eighth Amendment claim." (Doc. 20 at 3) (emphasis in original). Because Plaintiffs do not have a constitutional right to assess whether they have a claim, they have failed to state a claim for denial of access to the courts in violation of their due process rights.

- 15 -

**IT IS ORDERED granting in part** Plaintiffs' Motion for Preliminary Injunction (Doc. 11).  The following information must be disclosed:

    a. The manufacturer of lethal-injection drugs;

    b. The NDCs of lethal-injection drugs;

    c. The lot numbers of lethal-injection drugs; and

    d. The expiration dates of lethal-injection drugs.

In all other respects, the Motion is **denied**.

DATED this 7th day of October, 2013.

*[signature]*

Roslyn O. Silver
Senior United States District Judge